**UNITED STATES of America**

v.

**Dan PERKINS.**

**Crim. No. 1257–67.**

United States District Court
District of Columbia.
June 27, 1968.

James A. Strazzella, Asst. U. S. Atty., for the United States.

John J. Dwyer, Washington, D. C., for Dan Perkins.

## MEMORANDUM AND ORDER

YOUNGDAHL, Senior District Judge.

The defendant, Dan Perkins, is charged in a two-count indictment with violations of the narcotic laws.[1] This indictment arises out of the seizure of heroin capsules from the pocket of the defendant, found during a search at 941 M Street, N.W., incidental to Perkins' arrest on July 13, 1967. The defendant challenges the entry at 941 M Street, N. W., in the District of Columbia, and moves to suppress the evidence which the police obtained from the subsequent search.

After an evidentiary hearing, Judge Murphy, of the Court of General Sessions, held the entry proper in connection with charges pending in that court.[2] The instant case against defendant was sent to District Judge Aubrey Robinson for trial on February 28, 1968. A full evidentiary hearing was held on the motion to suppress and Judge Robinson denied the motion, orally stating his findings for the record. Thereafter, however, the defendant requested new counsel and the trial was postponed pending appointment of new counsel and the preparation of transcripts requested by the defendant. The case came before this Court for trial on June 12, 1968, and defendant's new counsel renewed the motion to suppress.

It was agreed by counsel that there was no need for further testimony in view of the February 28, 1968 hearing and this Court heard the arguments of counsel on the motion. The defendant waived a jury trial and it was stipulated that the defendant had committed the elements of the offenses alleged in the indictment.

Three detectives participated in the arrests on July 13, 1967; Detective Hankins and Detective Sergeant Paul (both of the Narcotics Squad, Metropolitan Police Department) and Private Johnson (who was working with the Narcotics Squad on July 13.) About 8:00 or 8:30 A.M. on the morning of July 13, Detective Paul received information from a previously reliable informant that Warren Williams was at 941 M Street, N.W., in room number 5, and that Williams was selling heroin at that location. Paul's informant further stated that the room Williams was in was "just a room" occupied not by Williams but by another man who was allowing it to be used as a narcotics "shooting gallery" [3] and "that the junkies were running up and down in the place." Paul was also informed that 941 M Street was a rooming house and room 5 was on the second floor.

---

1. 21 U.S.C. § 174 (1964 ed.) ; 26 U.S.C. § 4704(a) (1964 ed.).

2. D.C.Ct.Gen.Sess. Nos. U.S. 6396-67 to 6401-67 (opinion dated August 17, 1967). District Judge Walsh also upheld this entry in proceedings in this Court against another person who was one of defendant's companions in the room. United States v. (Warren) Williams, Crim. No. 1256-67; order of March 29, 1968.

3. A "shooting gallery" was described at the hearing as a place run by a person who would allow others to come there and use drugs. Williams, the informant stated, was in this particular place "servicing the addicts who were coming in the place and they were using it to shoot up."

Detectives Paul, Hankins and Johnson responded to the vicinity of 941 M Street. They had no warrant. Hankins and Paul stayed in a cruiser a short distance away while Johnson (who was less likely to be recognized by the suspects) was sent to place the premises at 941 M Street under observation.

Johnson started his observation at 9:30 or 9:45 and maintained continuous observance for about 45 minutes to an hour. In that time he observed five or six people go into the premises. They approached the front steps, went up, and walked through the front door; no attempt was made to knock or call anyone to that outside door.

During his surveillance Johnson also saw several persons, known as narcotics users, leave and enter a station wagon. Johnson relayed this information to Hankins and Paul and the occupants of the car were subsequently arrested on a parking lot a short distance away. A search of those arrested revealed narcotics paraphernalia consisting of needles, syringes and cookers. At the time of this arrest one of the men told a detective that the group had come from room 5 at the 941 M Street premises, that Warren Williams was there selling heroin, and that Williams was getting ready to leave shortly. The prisoners were taken from the scene by other officers and the three detectives proceeded to 941 M Street.

The building at 941 M Street is a three story row house in which people rent rooms. A series of steps leads to a landing at the front door and the front door opens into a hallway. There are rented rooms with doors on the first floor, as well as rooms on each floor. A stairway leads to the second floor hallway. Room 5, so numbered on the door, is on the second floor. Another set of steps at the end of the second floor hallway leads to the third floor. The uncontradicted testimony at the evidentiary hearing was that a person called Shannon rented room 5.

As the three detectives together approached 941 M Street a man, known as a user of drugs, was sitting on the front steps. Other than this individual, no one else was seen near the front door at the time the officers entered. Detectives Johnson and Paul testified that the front door was standing open on this summer day.[4] The detectives did not knock at the open front door.[5] They went directly to the second floor, hearing conversation from the second floor as they were on the stairs. The door to room 5 was also standing open. From the second floor hallway the officers observed four persons in the room; Williams, Shannon, Parker and the defendant—Perkins. Perkins had a hypodermic syringe in his hand and a tourniquet on his arm; the others were watching him. One of the officers identified them as police and announced the arrest. Perkins looked up and dropped the syringe. One of the detectives walked over to Perkins, again told him he was under arrest, searched him, and recovered ten gelatin capsules containing white powder in a cigarette package.

In argument before this Court, defense counsel conceded that if the officers came lawfully to their position of view outside room 5 then the subsequent seizure of narcotics from the defendant's pocket during the search incidental to his arrest was valid.[6] The defendant's position raises a narrow legal issue for this Court: whether the officers' warrantless entry through the front doorway of the building without announcing authority and purpose contravened the

---

4. The other detective could not recall positively whether the front door was open or closed, but believed it was closed.

5. The one witness who testified about the matter did not recall seeing any mail boxes outside the front door; he did not recall whether or not there was a doorbell

there. Defendant Perkins offered no evidence that there was any sort of bell at the front door.

6. See, e. g., Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).

Fourth Amendment or 18 U.S.C. § 3109 (1964 ed.)[7]

The Government argues that the entry through the *front doorway* of the premises is not the crucial entry and that no announcement was required at that point. The Government relies on the fact that this was not a private home, but rather, a rooming house with rented rooms on each floor. The room in which defendant Perkins was found was located on the second floor and was rented by Shannon. The Government contends that the peaceable entry through the first floor doorway into the relatively public and common hallways without announcement violated no privacy which enured to Shannon and his guests in room 5. This Court agrees.

Although several cases have discussed the general legality of means by which officers have entered buildings, few opinions have directly mentioned Section 3109 on facts like those presented here. The section was specifically before District Judge Weinfeld in United States v.

St. Clair, 240 F.Supp. 338 (S.D.N.Y. 1965). In *St. Clair,* based on accumulated information and without any warrant, narcotics agents went to an apartment building which housed five apartments. Entrance to the building was through a vestibule at street level, and the door from the vestibule to the common hallway was kept locked. While the agents were talking to the landlord, who was refusing them entrance at that door, one of the agents slipped into the building and subsequently confronted the subject when he opened his apartment door; the agent announced his authority and purpose before entering the apartment, and narcotics were subsequently seized during a search. The Court held that the announcement at the threshold of the *defendant's apartment* was sufficient to comply with Section 3109. 240 F.Supp. at 340.[8]

The Court of Appeals for the Second Circuit has also had occasion to pass on a related point. In United States v. Miguel, 340 F.2d 812 (2d Cir.), cert. denied, 382 U.S. 859, 86 S.Ct. 116, 15 L.

---

7. That statute provides:
    "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."
    On the statute, see generally, Blakey, The Rule of Announcement and Unlawful Entry, 112 U.Pa.L.Rev. 499 (1964). The statute has been interpreted as applying to the entry of a federal officer in order to effect an arrest without a warrant and requiring an announcement in that situation. See, Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958).

8. The defendant also claimed that the *means* used to gain entrance vitiated the search from its inception. In also rejecting this claim, the court noted that "the hallway, used by tenants and the public alike, was not part of the defendant's apartment." (Ibid.) Recognizing that "in urban centers * * * the multi-family dwelling is the mode of life" (Ibid.), the court concluded that in these circumstances

"to hold that the common corridors, public hallways, landings and stairwells may be considered part of the tenant's home and that his right of privacy under the Fourth Amendment extends to such areas, would raise unreasonable barriers to law enforcement. To require, as a condition of a lawful and reasonable search of an apartment, the consent of a tenant or a landlord to admission to the public areas which give access to the apartment would mean that enforcement officers, having probable cause to arrest, whether with or without a warrant, would in many instances necessarily alert a suspect, thereby affording him ample opportunity to flee or to destroy the fruits or instruments of the crime or contraband. No test of reasonableness under the Fourth Amendment decisions requires that any such doctrine be applied."
240 F.Supp. at 340–341. Compare United States v. Blank, 251 F.Supp. 166 (N.D. Ohio 1966), where the officers broke a window to get through a locked outer door of an apartment house, then axed their way through the door of the subject's apartment without previous announcement.

Ed.2d 97 (1965), narcotics agents, acting on information which would indicate that a suspect was going to certain premises to obtain narcotics in order to consummate a sale, followed the suspect to an apartment building. The agents entered the lobby of the apartment house and watched while the subject took an elevator to an upper floor and arrested him in the lobby when he returned. The subject moved to suppress the narcotics found on his person on the theory that the officers were improperly in the lobby, but the Court of Appeals upheld the refusal to suppress. The court noted:

> "We have been cited no authority which would include the lobby of a multi-tenanted apartment house within the 'curtilage' of each tenant. Such authority as there is points the other way." [9]

The Court of Appeals for this Circuit has highlighted the difference between an apartment or rented room itself and the corridors of a building housing such dwellings. In Whitley v. United States, 99 U.S.App.D.C. 159, 237 F.2d 787 (1956), narcotics officers entered a three story rooming house on information from an informant and went to the third floor. Through an open door they saw a woman in the bathroom and arrested her. Several of the officers went through the bathroom window onto a porch. From that vantage point they looked into a bedroom and saw a second woman (Meredith) preparing to give herself a hypodermic injection; they entered the bedroom and found narcotics there during a search. Holding that the police were not properly in their position of view, the court said:

> "Since the porch from which the police saw Meredith was not open to the

public and the police reached it through a window, they had no right to be on the porch, *whatever may be thought of their previous presence in the relatively public corridors of the rooming house.*"

99 U.S.App.D.C. at 160, 237 F.2d at 788. (Emphasis supplied). The court did not criticize the original entry into the rooming house through the front door.

This lack of criticism of entry through outer doors into relatively public corridors of rooming houses or apartment houses is also conspicuous by its absence in other cases. In the recent case of Sabbath v. United States, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968), officers entered an apartment building and proceeded to the door of the suspect's apartment; the Supreme Court held that the officers' entrance through the door to the apartment did not comply with Section 3109, but it did not indicate that the officers' entry into the apartment building itself was in any way improper.[10]

Neither the logic of the Fourth Amendment nor the policy underlying Section 3109 would require an announcement at the front door in the instant case. The officers entered by way of the common, open means of ingress normally used by those who came to the premises. No privacy of the defendant's was unreasonably invaded, no affront was made to the integrity of his home, and no potential for harm to the officers was stirred by the officers' peaceful unannounced passage through the open front doorway. On the contrary, a requirement of announcement at the common doorway—either so distant from the subject as to serve no purpose, or so shouted as to unnecessarily multiply the possibility of flight or destruction of ev-

---

9. 340 F.2d at 814. See United States v. Price, 345 F.2d 256, 259 n. 3, (2d Cir.), cert. denied, 382 U.S. 949, 86 S.Ct. 404, 15 L.Ed.2d 357 (1965).

10. See also White v. United States, 120 U.S.App.D.C. 319, 346 F.2d 800 (1965), cert. denied, 382 U.S. 1014, 86 S.Ct. 625, 15 L.Ed.2d 529 (1966); Keiningham v. United States, 109 U.S.App.D.C. 272, 287 F.2d 126 (1960). Cf., United States v. Buchner, 164 F.Supp. 836 (D.D.C.), aff'd, 106 U.S.App.D.C. 16, 268 F.2d 891 (1958), cert. denied, 359 U.S. 908, 79 S.Ct. 584, 3 L.Ed.2d 573 (1959).

idence—is unwarranted. It would serve no purpose to require officers to knock on hotel, apartment building, rooming house, or office building lobby doors, when their mission is to one of the apartments or rooms inside.[11]

Defendant makes the further argument that the officers had probable cause for a warrant to arrest Williams and that their entry into the building was a pretext for a search. This argument is irrelevant in light of this Court's finding that the critical entry was the entry into room 5 and not the entry through the front doorway of the rooming house. In any event this argument was rejected by Judge Robinson at the evidentiary hearing and this Court agrees that it has no merit.

Wherefore, it is ordered that the defendant's motion to suppress is hereby denied and defendant is found guilty of the offenses charged in the indictment. Defendant is to be sentenced on Friday, June 28, 1968.

11. The cases relied upon by defendant involve private residences and are not on point. Morrison v. United States, 104 U.S.App.D.C. 352, 262 F.2d 449 (1958) (subject's own private house); Whitley v. United States, 99 U.S.App.D.C. 159, 237 F.2d 787 (1956) (entry which court discussed was entry into subject's room, not the rooming house itself; court contrasted "relatively public corridors of the rooming house"); Work v. United States, 100 U.S.App.D.C. 237, 243 F.2d 660 (1957) (private home of the subject even though some rooms were occupied by others).