[No. A024254. First Dist., Div. Two. Dec. 17, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
NEIL DAVID MacAVOY, Defendant and Appellant.

748

## Counsel

Thomas J. Nolan, Andrew H. Parnes, Nolan & Parnes, Charles C. Marson and Remcho, Johansen & Purcell for Defendant and Appellant.

John K. Van de Kamp, Attorney General, and Herbert F. Wilkinson, Deputy Attorney General, for Plaintiff and Respondent.

## Opinion

**KLINE, P. J.**—Neil David MacAvoy appeals from the judgment of conviction entered after he pled guilty to possession of concentrated cannabis and possession of cocaine for sale. (Health & Saf. Code, §§ 11357, subd. (a), 11351.) Appellant was placed on 3 years probation, conditioned on his serving 50 days in county jail, devoting 200 hours to community service work, and paying a fine.

The issues on appeal concern the search of appellant's room in a fraternity house located on the Stanford University campus. Appellant contends that the warrant authorizing the search did not adequately describe the place to be searched, and that the police did not comply with the California "knock-notice" requirement in executing the warrant. Although we conclude that the warrant is defective in that it failed to adequately describe the place to be searched, we find the evidence seized pursuant to the warrant was none-

theless admissible under the "good faith" exception recently articulated by the United States Supreme Court in *United States* v. *Leon* (1984) — U.S. — [82 L.Ed.2d 677, 104 S.Ct. 3405] and *Massachusetts* v. *Sheppard* (1984) — U.S. — [82 L.Ed.2d 737, 104 S.Ct. 3424]. We therefore affirm the judgment of the trial court.

### FACTS

In September of 1982[1] a customs inspector and his trained canine assistant were inspecting foreign parcels which had arrived at San Francisco International Airport. The dog "reacted" to a small package addressed to Neil MacAvoy, Alpha Delta Phi, 375 Campus Dr., Stanford, California, and sent by one Keith Godchaux from the People's Republic of China. Subsequent testing of the contents of the package indicated it contained hashish. Thereafter, postal authorities contacted the Department of Public Safety at Stanford to arrange for a controlled delivery of the package.

Before the controlled delivery was made, Detective Iran White of the Stanford Department of Public Safety secured a search warrant which described the place to be searched as "the premises consisting of a two-story, multi room structure located on the north side of Campus Drive, Stanford, California. The main entrance of the building faces south. The building is of stucco construction and the exterior is painted off-white. The structure has a red tile roof and there are large letters identifying the premises as Alpha Delta Phi, each letter approximately 18″ to 24″ in height. [L]ocated at 375 Campus Drive, Stanford, County of Santa Clara, State of California."

Detective White's affidavit in support of the search warrant essentially related the discovery of the contraband and the intent to carry out a controlled delivery of the package. The affidavit made it clear that the package

---

[1]We note that since the criminal activity in this case occurred after the effective date of Proposition 8 (June 9, 1982), the "truth-in-evidence" portion of that law applies to the case before us. (*People* v. *Smith* (1983) 34 Cal.3d 251, 258 [193 Cal.Rptr. 692, 667 P.2d 149]; Cal. Const., art. I, § 28, subd. (d).) Our analysis assumes that article I, section 28, subdivision (d), constrains us to adhere to United States Supreme Court interpretations of the federal Constitution, and that evidence cannot be made inadmissible on the basis of independent state constitutional grounds. Since the scope and effect of the truth-in-evidence provision is currently before our Supreme Court (*In re Lance W.*■ (Cal.App.) hg. granted Feb. 22, 1984; *In re Randy H.* (Cal.App.) hg. granted May 17, 1984) we merely note this assumption, and note also that it is consistent with statements in several appellate opinions that have avoided meeting this issue head on. (See *Tharp* v. *Superior Court* (1984) 154 Cal.App.3d 215, 218, fn. 5 [201 Cal.Rptr. 131]; *People* v. *Anderson* (1983) 149 Cal.App.3d 1161, 1164 [197 Cal.Rptr. 413]; *People* v. *Tockgo* (1983) 145 Cal.App.3d 635, 640, fn. 2 [193 Cal.Rptr. 503]; *Jeter* v. *Superior Court* (1983) 138 Cal.App.3d 934, 938 [188 Cal.Rptr. 351].)

had been mailed to Neil MacAvoy. Attached as an exhibit to the affidavit was a Stanford Department of Safety "Felony Incident Report," which also related the discovery of the contraband and the intent to carry out a controlled delivery. The report listed the "suspect/arrestee" as Neil David MacAvoy and gave his address as 375 Campus Drive, Stanford, CA. Appended to the report was a typewritten note from Officer Raoul Niemeyer of the Stanford Department of Public Safety indicating that he had learned from the facilities manager that David MacAvoy was assigned to room No. 112 and that his investigation was continuing.

On October 6, 1982, a postal inspector delivered the package to appellant at the fraternity house. The next day, Officer White, who was assisted by Deputy David Weidler of the Santa Clara County Sheriff's office and several other officers, executed the warrant. After entering the fraternity, Officers White and Weidler went directly to appellant's room (No. 112) where they demanded entry after announcing they were police officers in possession of a search warrant. Appellant's room was then searched and small amounts of hashish, marijuana, cocaine, and a scale were seized. There was no evidence that any of the officers searched any part of the fraternity house other than appellant's room.

Appellant's motions to suppress evidence (Pen. Code, § 1538.5) and to set aside the information (Pen. Code, § 995) were denied. Subsequently, appellant pled guilty to one count of possession of concentrated cannibis and one count of possession of cocaine for sale. This appeal followed.

DISCUSSION

I

A. The search warrant was void on its face because it failed to adequately describe the place to be searched.

Appellant contends the search warrant was void because it did not meet the Fourth Amendment's requirement that the place to be searched be described with particularity because it authorized a search of the entire fraternity, even though probable cause existed only to search appellant's room. Initially, we note the parties entered into a stipulation that the approximately 50 residents of the fraternity house are assigned rooms by the university and are issued keys to their individual rooms. Thus, for the purposes of our analysis, the fraternity house is essentially a multiunit structure with certain common areas shared by all residents.

Both the United States Constitution and the Constitution and statutory law of California require that a search warrant describe with particu-

larity the place to be searched. (U.S. Const., 4th Amend.; Cal. Const., art. I, § 13; Pen. Code, § 1525.) ■ Whether this requirement is met is a question of law on which an appellate court makes an independent judgment. (See *Thompson* v. *Superior Court* (1977) 70 Cal.App.3d 101, 108 [138 Cal.Rptr. 603].) ■ As a general rule, the requirement is satisfied if "the officer conducting the search 'can with reasonable effort ascertain and identify the place intended.'" (*People* v. *Dumas* (1973) 9 Cal.3d 871, 880 [109 Cal.Rptr. 304, 512 P.2d 1208], quoting *Steele* v. *United States* (1925) 267 U.S. 498, 503 [69 L.Ed. 757, 760, 45 S.Ct. 414]; see also *People* v. *Superior Court* (*Fish*) (1980) 101 Cal.App.3d 218, 222 [161 Cal.Rptr. 547]; *People* v. *Estrada* (1965) 234 Cal.App.2d 136, 146 [44 Cal.Rptr. 165, 11 A.L.R.3d 1307].)

■ As stated by then Presiding Justice Sullivan in *People* v. *Estrada, supra,* "the requirement of the Fourth Amendment that a particular 'place' be described in the warrant when applicable to dwellings means a single living unit, that is to say the residence of one person or family, and a warrant describing an entire building issued on probable cause for searching only one apartment therein is void. [Citations.] Accordingly when a warrant directs a search of a multiple occupancy apartment house or building, absent a showing of probable cause for searching each unit or for believing that the entire building is a single living unit, the warrant is void and a conviction obtained on evidence seized under it cannot stand." (234 Cal.App.2d at p. 146.) ■ After analyzing pertinent federal authorities, Justice Sullivan distilled the following rule for testing the specificity of a search warrant directed to premises with multiple occupants: "If the description in the warrant limits the search to a particular part of the premises either by a designation of the area or other physical characteristics of such part or by a designation of its occupants, the business conducted there, or otherwise so that the officer executing the warrant can with reasonable effort identify the place to be searched, the warrant will meet Fourth Amendment requirements in respect to the description of the place to be searched. In our opinion if measured by the same test it will also meet the corresponding California constitutional and statutory requirements." (*Id.,* at p. 148.)

■ The People do not claim probable cause existed for searching every room in the fraternity; nor do they argue that there were grounds for believing that the "entire building is a single living unit." (*Id.,* at p. 146.) It is thus clear that the description on the face of the warrant was inadequate to meet the Fourth Amendment particularity requirement. Although the warrant accurately describes the Alpha Delta Phi fraternity, it fails to restrict the search to room 112 or the residence of Neil MacAvoy. On its face, the warrant would allow the officers to search every part of the fraternity house; since probable cause existed to search appellant's room only, the warrant,

as a general rule, is void. (*United States* v. *Votteller* (6th Cir. 1976) 544 F.2d 1355, 1363; *United States* v. *Parmenter* (D.C. Mass. 1982) 531 F.Supp. 975, 978; *People* v. *Estrada, supra,* 234 Cal.App.2d at p. 146.)

B. The defect on the face of the warrant cannot be cured by reference to the underlying affidavit.

■ Although the People essentially concede that the warrant is defective *on its face,* they maintain that this defect is cured by reference to the underlying affidavit, which they claim *does* adequately describe the place to be searched. As explained in *United States* v. *Parmenter, supra,* "[o]ver the years the courts have recognized certain exceptions and qualifications to the general rule that a warrant which fails to specify the particular sub-unit to be searched within a multiple occupancy structure is void." (531 F.Supp. at p. 979.) The "qualification" which the People rely on in the present case is that a "deficiency of description contained in the warrant can be cured by reference to its supporting affidavit. . . ." (*Id.,* at p. 980.)

■ There is a fundamental distinction, however, between a warrant and the underlying affidavit, and the affidavit is not necessarily a part of the warrant or available to define the scope of the warrant. (*Moore* v. *United States* (D.C. Cir. 1972) 461 F.2d 1236, 1238.) ■ Federal courts and many state courts have generally allowed a deficient description of the place to be searched or items to be seized to be cured by reference to the affidavit *only* where (1) the affidavit accompanies the warrant at the time it is served, and (2) the warrant uses suitable words of reference which incorporate the affidavit by reference. (*Matter of Property, etc.* (9th Cir. 1981) 644 F.2d 1317, 1319; *Application of Lafayette Academy, Inc.* (1st Cir. 1979) 610 F.2d 1, 4; *United States* v. *Klein* (1st Cir. 1977) 565 F.2d 183, 186, fn. 3; *Moore* v. *United States, supra,* 461 F.2d at p. 1238; see also 2 LaFave, Search and Seizure (1978) § 4.5, pp. 73-74 and state cases therein cited at fn. 10.) The requirement that the affidavit be incorporated into and attached to the warrant insures that both the searchers and those threatened with search are informed of the scope of the searcher's authority. (*United States* v. *Wuagneux* (11th Cir. 1982) 683 F.2d 1343, 1351, fn. 6; *Matter of Property, etc., supra,* 644 F.2d at p. 1319.) "When the affidavit is incorporated into the warrant and limits the generality of the description in the warrant, the discretion of the officers executing the warrant is limited. When the affidavit accompanies the warrant the person being searched has notice of the specific items the officer is entitled to seize [or, as in the present case, the specific area he is entitled to search]." (*Matter of Property, etc., supra,* 644 F.2d at p. 1319.) Thus, the requirements of incorporation by reference and attachment provide the same protection provided by an adequate description on the face of the warrant: clear notice to the executing officer and

those subject to search of the authorized scope of the search *at the time the warrant is executed.*

Although, as indicated, the general rule is elsewhere well established that an affidavit may cure the defect in a warrant only where the affidavit is attached to the warrant at the time of execution and incorporated therein by reference, no California court has directly addressed this question where, as here, the lack of particularity in the warrant relates to the premises to be searched. A California court has, however, addressed the very closely related question whether an affidavit can be utilized to save a warrant that is insufficiently particular with respect to the property to be seized.

In *Thompson* v. *Superior Court, supra,* 70 Cal.App.3d 101, two police officers obtained a search warrant based on an affidavit by one of the officers containing information that the defendant was in possession of stolen handguns. The search warrant authorized the officers to search for and confiscate "stolen property" and "personal property tending to establish the identity of persons in control of the premises or storage areas where *stolen property* is found." (*Id.,* italics in original, at p. 105.) While searching the premises the officers found no handguns but did find amphetamines and chicken fighting paraphernalia. The People conceded that the warrant itself was constitutionally overbroad because it would enable an officer to engage in an unlimited exploratory search of all personal property in the described premises. However, the People contended in *Thompson,* as they do here, that any uncertainty as to the executing officer's authority under the warrant could be remedied by the affidavit. The Court of Appeal rejected this contention for several reasons.

The principal reason relied upon by the court was that "a search warrant which describes the property to be seized in a broad general category is constitutionally invalid notwithstanding the particularity with which the supporting affidavit sets forth the alleged crime." (*Id.,* at p. 109.) After analyzing the decision of the Supreme Court in *Burrows* v. *Superior Court* (1974) 13 Cal.3d 238 [118 Cal.Rptr. 166, 529 P.2d 590], the *Thompson* court noted that "[t]he reason for this limitation on the use of the affidavit to save the warrant is obvious: the property to be seized pursuant to the warrant is not within the discretion of the executing officer. As stated in *People* v. *Dumas* [1973] 9 Cal.3d [871] at page 880 [109 Cal.Rptr. 304, 512 P.2d 1208], 'The description in a search warrant must be sufficiently definite that the officer conducting the search "can with reasonable effort ascertain and identify" [the property to be seized.] [Citation omitted.] Nothing should be left to the discretion of the officer.' (See also *Marron* v. *United States* [1927] 275 U.S. at p. 196 [72 L.Ed.3d at p. 237].) Thus, the scope of the officer's authority *is determined from the face of the warrant*

*and not from the affidavit.* The cogency of this rule becomes apparent when we consider the fact that the executing officer may not have a copy of the affidavit or even have knowledge of its contents when he serves the warrant." (*Thompson* v. *Superior Court, supra,* 70 Cal.App.3d at p. 109. Italics added.)[2]

Lack of particularity in the warrant with respect to identification of the property to be seized, as in *Thompson,* is conceptually indistinguishable from lack of particularity in the warrant with respect to the premises to be searched, which is the defect of the instant warrant.[3] The reasons for prohibiting use of the affidavit to save the warrant in the former situation therefore apply with equal force to the latter.

Our view that the rule articulated in *Thompson* should be applied here is not, however, without qualification. The *Thompson* holding that, in determining the property to be seized pursuant to a warrant, a court is "confined to the four corners of the warrant" (*id.,* at p. 112) would bar recourse to the affidavit even if it were attached to the warrant at the time of execution and incorporated therein by reference.[4] Though it is certainly the better practice for a warrant to be sufficiently particular in and of itself, we are

---

[2]The *Thompson* court also rejected the contention that the affidavit in that case could be used to remedy the uncertainty of the warrant for two additional reasons: first, the fact that the warrant authorized a broader search than that justified by the supporting affidavit (70 Cal.App.3d at p. 110) and, second, that there was no ambiguity in the language of the warrant that justified recourse to the affidavit for clarification. (*Id.*) In light of our holding that the affidavit in the present case cannot be utilized to remedy the defect in the warrant because it was neither attached to the warrant at the time of execution nor incorporated in the warrant by reference, it is unnecessary for us to determine whether the additional reasons relied on in *Thompson* also apply here.

[3]The equivalence of the two situations was indirectly acknowledged in *Thompson* by the court's recognition of the need to distinguish three appellate cases that had earlier held that where there is an ambiguity in the warrant as to the persons or place to be searched, the affidavit can be utilized to save the warrant from a finding of invalidity. (*People* v. *Grossman* (1971) 19 Cal.App.3d 8, 12-13 [96 Cal.Rptr. 437]; *People* v. *Moore* (1973) 31 Cal.App.3d 919, 925-927 [107 Cal.Rptr. 590]; *People* v. *Peck* (1974) 38 Cal.App.3d 993, 1000 [113 Cal.Rptr. 806].) The court distinguished these cases on two grounds: "First, the omission of the descriptive facts in the warrant causing the so-called 'ambiguity' was clearly the result of inadvertence or 'clerical error.' Second, in each case the search pursuant to the warrant did not exceed the scope of the facts alleged in the affidavit. Under these circumstances the courts were able to declare that the search was, in fact, commensurate with the authority contained in the warrant." (*Thompson* v. *Superior Court, supra,* 70 Cal.App.3d at p. 111.) We are not as certain as the *Thompson* court that *Grossman, Moore* and *Peck* can be so easily dismissed. Nonetheless, we do not think that *Grossman* and *Moore* constrain us because it is not clear from either opinion whether the affidavit was attached to the warrant in question or incorporated by reference in that warrant. We decline to follow *Peck* because we think its reasoning is inferior to that of the large body of federal case law that supports the rule we adopt.

[4]Indeed, the opinion in *Thompson* does not disclose whether the affidavit in that case was attached to or incorporated by reference in the warrant.

unwilling to flatly declare that a deficiency in a warrant with respect to the premises to be searched may in no circumstances be remedied by an affidavit which is attached thereto at the time of execution and incorporated therein by reference. An affidavit which meets these two requirements may be considered to remedy a warrant that does not on its face meet the demands of particularity.[5] Without imposing hypertechnical or otherwise undue constraints on law enforcement, this rule operates in a common sense and realistic fashion to advance the vital purpose of the particularity requirement of the Fourth Amendment—the prevention of general exploratory searches which unreasonably interfere with a person's right to privacy. (*Stanford* v. *Texas* (1965) 379 U.S. 476, 481 [13 L.Ed.2d 431, 434, 85 S.Ct. 506]; *Berger* v. *New York* (1967) 388 U.S. 41, 53 [18 L.Ed.2d 1040, 1049, 87 S.Ct. 1873].)

 Applying the rule to the facts of the case before us, it is evident the affidavit may not be considered. First, the warrant does not in any way incorporate the affidavit by reference. Secondly, there is no evidence that the affidavit accompanied the warrant at the time of service. (*United States* v. *Klein, supra,* 565 F.2d at p. 186, fn. 3.) Thus, since the affidavit was not available at the time of the search to put both the searcher and those who suffered the search on notice of its permissible scope, the affidavit cannot be used after the fact to cure a defect on the face of the warrant.[6]

We therefore conclude that the warrant is defective.

## II

 Having concluded that appellant's room was searched under an invalid warrant, we turn now to the separate and distinct question concerning appellant's remedy for the violation of his Fourth Amendment rights. Traditionally, violations of Fourth Amendment rights have been remedied by excluding from the prosecution's case all evidence obtained during the

---

[5]Whether such an affidavit will actually operate to cure a descriptive defect in the warrant depends, of course, upon whether the substance of the affidavit reasonably provides both the officer executing the warrant and the occupants of the premises to be searched specific notice of the scope of the officer's authority.

[6]We note, by way of obiter dictum, that the affidavit would not likely cure the defect in the warrant even if it could properly be considered for that purpose. The affidavit, which was prepared by Detective White of the Stanford Department of Public Safety, contains virtually the identical general description of the entire fraternity house set forth in the warrant. The only pertinent document in the record that specifically identifies appellant's room is a note from Stanford Department of Public Safety Officer Niemeyer relating that a facilities manager "stated that [appellant] was assigned room #112. Investigation Continuing." As earlier mentioned, this note appears to have been attached to the felony incident report that comprised exhibit A to the affidavit; however, it was not referred to in the warrant, the affidavit or the report.

course of an illegal search. (*Weeks* v. *United States* (1914) 232 U.S. 383, 393-394 [58 L.Ed. 652, 655-656, 34 S.Ct. 341]; *Mapp* v. *Ohio* (1961) 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684]; *People* v. *Cahan* (1955) 44 Cal.2d 434, 445 [282 P.2d 905, 50 A.L.R.2d 513].) However, two United States Supreme Court decisions, decided in July of 1984, now hold that "the exclusionary rule should not be applied when the officer conducting the search acted in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate that subsequently is determined to be invalid . . . ." (*Massachusetts* v. *Sheppard, supra,* — U.S. — [82 L.Ed.2d at p. 743, 104 S.Ct. at p. 3428]; see also *United States* v. *Leon, supra,* — U.S. — [82 L.Ed.2d 677, 104 S.Ct. 3405].)

A. *Leon* and *Sheppard* apply retroactively to the instant case.

Before we decide whether the case at bench falls within the exception to the exclusionary rule articulated in *Leon* and *Sheppard,* we must first determine whether these cases apply retroactively in the first instance.

As a general rule, decisions of the United States Supreme Court on constitutional matters operate retroactively. (*United States* v. *Estrada* (9th Cir. 1984) 733 F.2d 683, 685; 3 LaFave, Search and Seizure (1978) § 11.5, p. 682.) Nevertheless, under certain circumstances decisions which have *broadened* Fourth Amendment rights or the operation of the exclusionary rule have been held to be nonretroactive. (3 LaFave, *supra,* at pp. 684-689; see *United States* v. *Johnson* (1982) 457 U.S. 537 [73 L.Ed.2d 202, 102 S.Ct. 2579]; *United States* v. *Peltier* (1975) 422 U.S. 531 [45 L.Ed.2d 374, 95 S.Ct. 2313]; *Desist* v. *United States* (1969) 394 U.S. 244 [22 L.Ed.2d 248, 89 S.Ct. 1030]; *Williams* v. *United States* (1971) 401 U.S. 646 [28 L.Ed.2d 388, 91 S.Ct. 1148]; *Linkletter* v. *Walker* (1965) 381 U.S. 618 [14 L.Ed.2d 601, 85 S.Ct. 1731].) However, this exception to the normal rule of retroactivity has never been applied to decisions *narrowing* Fourth Amendment rights or restricting the operation of the exclusionary rule. As noted by the Ninth Circuit: "We have never denied retroactive application to a new decision that *limits* the Fourth Amendment's exclusionary rule . . . . [D]ecisions limiting the exclusionary rule are fully retroactive." (*United States* v. *Estrada, supra,* 733 F.2d at p. 685, italics in original; see also, 3 LaFave, *supra,* at pp. 698-699.)

This pattern makes sense in light of the purpose underlying a court's refusal to apply certain search and seizure decisions retroactively, which is "to avoid penalizing police conduct when the police reasonably relied on existing judicial precedent. *United States* v. *Peltier,* 422 U.S. 531, 537-39 . . .; *see, e.g., United States* v. *Stewart,* 595 F.2d 500, 504 (9th Cir. 1979). When a court determines that a particular police practice does *not* violate

the Constitution [or evidence is otherwise admissible], there is no reason not to apply that decision retroactively." (*United States* v. *Johns* (9th Cir. 1983) 707 F.2d 1093, 1097, italics in original.) While agreeing with this basis analysis, Professor LaFave explains it somewhat differently: "True, the officer . . . acted contrary to a previously-adopted rule of the Supreme Court which that Court had not yet abandoned, but to suppress now in the name of deterrence would make sense only if there was some reason to believe that otherwise police might violate other Supreme Court decisions in the expectation that the Court would abandon them . . . that possibility seems fanciful . . . ." (3 LaFave, *supra,* § 11.5(d), at p. 699 and 1984 pocket supp., at p. 276.)

The above analysis has been utilized in numerous instances to retroactively apply Supreme Court Fourth Amendment and exclusionary rule decisions which are less beneficial to a defendant than the cases they overturn. (3 LaFave, *supra,* (1984 pocket supp.) § 11.5, p. 276 and cases cited therein.) A similar analysis was recently utilized by the Fourth District Court of Appeal to support its decision to apply *Leon* retroactively. (*People* v. *Helmquist* (1984) 161 Cal.App.3d 609, 614-616 [207 Cal.Rptr. 718].) Since *Leon* and *Sheppard* clearly *restrict* the operation of the exclusionary rule, and are less beneficial to appellant than prior law, we agree with the decision in *Helmquist* and find that the nonretroactivity decisions are inapposite and *Leon* and *Sheppard* should be given retroactive effect.[7]

B. The good faith exception is applicable in this case.

Having concluded that *Leon* and *Sheppard* apply to the instant case, we must next determine whether the exception to the exclusionary rule therein articulated applies to the facts before us. We conclude that the exception does apply, and that the evidence is therefore admissible.

In *Leon, supra,* the United States Supreme Court considered whether the exclusionary rule should apply where officers conducted a search in good faith reasonable reliance on a facially valid warrant issued by a neutral and detached magistrate which is later determined to lack probable cause for its issuance. (— U.S. at p. — [82 L.Ed.2d at p. 688, 104 S.Ct. at p. 3412].) In reaching the conclusion that the exclusionary rule should not apply in these circumstances, the *Leon* majority noted initially that "[w]hether the exclusionary sanction is appropriately imposed in a partic-

---

[7]Since *Leon* and *Sheppard* were decided so recently their effect has been discussed in exceedingly few published opinions. However, the few cases that have discussed *Leon* and *Sheppard* have assumed, without analysis, that they are to be applied retroactively. (*United States* v. *Thornton* (D.C. Cir. 1984) 746 F.2d 39; *Adkins* v. *Texas* (Tex.Civ.App. 1984) 675 S.W.2d 604.)

ular case . . . is 'an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.'" (*Id.,* at p. — [82 L.Ed.2d at p. 688, 104 S.Ct. at p. 3412], quoting *Illinois* v. *Gates* (1983) 462 U.S. 213 [76 L.Ed.2d 527, 538-539, 103 S.Ct. 2317, 2324].) The majority stated that the former question "must be resolved by weighing the costs and benefits of preventing the use in the prosecution's case-in-chief of inherently trustworthy tangible evidence obtained in reliance on a search warrant issued by a detached and neutral magistrate that ultimately is found to be defective." (*Id.,* at p. — [82 L.Ed.2d at p. 688, 104 S.Ct. at pp. 3412-3413].) The court identified the primary costs of excluding evidence as the interference with the truth-finding functions of the judge and jury and the collateral consequence that "some guilty defendants may go free or receive reduced sentences as a result of favorable plea bargains." (*Id.,* at p. —, fn. omitted [82 L.Ed.2d at p. 688, 104 S.Ct. at pp. 3412-3413].)

The primary benefit identified by the majority flowing from the suppression of illegally seized evidence is the deterrence of police misconduct. The majority found that the exclusionary rule is not designed to punish the errors of judges and magistrates or to work as a deterrent to *judicial,* as opposed to *police,* misconduct. (— U.S. —, *supra,* at p. — [82 L.Ed.2d at pp. 694-695, 104 S.Ct. at pp. 3418-3419].) The court thus concluded that "[i]f exclusion of evidence . . . is to have any deterrent effect it must alter the behavior of individual law enforcement officers or the policies of their departments." (*Id.,* at p. — [82 L.Ed.2d at p. 695, 104 S.Ct. at p. 3419].) The court noted that future police conduct will not be affected by the suppression of evidence obtained by an officer acting with a good faith reasonable belief that the search he has undertaken is lawful. (*Id.,* at p. — [82 L.Ed.2d at p. 697, 104 S.Ct. at p. 3420].) "This is particularly true . . . when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope. In most such cases, there is no police illegality and thus nothing to deter." (*Id.,* at p. —, fn. omitted [82 L.Ed.2d at p. 697, 104 S.Ct. at p. 3420].) The court therefore concluded that "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." (*Id.,* at p. — [82 L.Ed.2d at p. 698, 104 S.Ct. at p. 3421].)

The court went on to emphasize that although "'a warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search . . .'" reliance on the magistrate's probable cause determination and on the technical sufficiency of the warrant must nevertheless be objectively reasonable. (— U.S. —, *supra,* at p. — [82 L.Ed.2d at p. 698, 104 S.Ct. at p. 3421], quoting *United States*

v. *Ross* (1982) 456 U.S. 798, 823 [72 L.Ed.2d 572, 593, 102 S.Ct. 2157].) The court specifically noted that suppression is still proper where the warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." (*Id.*, at p. — [82 L.Ed.2d at p. 699, 104 S.Ct. at p. 3422].)

In a companion case, *Massachusetts* v. *Sheppard, supra,* — U.S. —, [82 L.Ed.2d 737, 104 S.Ct. 3424], the Supreme Court applied the law articulated in *Leon* to facts involving a warrant supported by probable cause but defective on its face because it failed to adequately describe the items to be seized. *Sheppard* involved a search of a residence belonging to a defendant who was suspected of murdering his girlfriend. The girlfriend was found dead in a vacant lot, the victim of multiple compound fractures caused by blows to the head. The affidavit in support of the search warrant specified that the police wished to search for " '[a] fifth bottle of amaretto liquor, 2 nickel bags of marijuana, a woman's jacket that has been described as black-grey (charcoal), any possessions of Sandra D. Boulware [the victim], similar type wire and rope that match those on the body of Sandra D. Boulware, or in the above Thunderbird. A blunt instrument that might have been used on the victim, men's or women's clothing that may have blood, gasoline burns on them. Items that may have fingerprints of the victim.' "[8] (*Id.*, at p. — [82 L.Ed.2d at p. 741, 104 S.Ct. at p. 3427].)

Because the police sought to obtain the warrant on a Sunday, when the local court was closed, they were unable to locate an appropriate warrant form. The detective in charge of the search found a warrant form used in another county for searches of controlled substances. The detective took the affidavit and the warrant to the residence of a judge who had agreed to consider the warrant application. The judge, after reading the affidavit, agreed to authorize the requested warrant. The detective then tendered the controlled substance warrant form to the judge and told him that the warrant form dealt with controlled substances. After unsuccessfully searching for a more suitable form, the judge said he would make the necessary changes to the warrant. The judge took the form, made some changes to it, and dated and signed it. However, he failed to change the directory portion of the warrant which authorized a search for "any controlled substance, article, implement or other paraphernalia used in, for, or in connection with the unlawful possession or use of any controlled substance . . . ." (— U.S. —, *supra,* at p. —, fn. 2 [82 L.Ed.2d at p. 742, 104 S.Ct. at p. 3427, fn.

---

[8]In a footnote at this point, the court states: "The liquor and marihuana were included in the request because Sheppard had told the officers that when he was last with the victim, the two had purchased two bags of marihuana and a fifth of amaretto before going to his residence."

2].) The judge returned the warrant to the detective and assured him that the warrant was now valid for the intended search. In executing the warrant, the detective seized only those items listed in the affidavit, including blood-stained clothing, a hair piece belonging to the victim, and wire as described in the affidavit. (*Id.*, at p. — [82 L.Ed.2d at p. 743, 104 S.Ct. at p. 3428].)

The *Sheppard* court framed the issue before it in the following manner: "Having already decided [in *Leon*] that the exclusionary rule should not be applied when the officer conducting the search acted in objectively reason-able reliance on a warrant issued by a detached and neutral magistrate that subsequently is determined to be invalid, . . . the sole issue before us in this case is whether the officers reasonably believed that the search they conducted was authorized by a valid warrant." (— U.S. —, *supra,* at p. — [82 L.Ed.2d at p. 743, 104 S.Ct. at p. 3428].) The court, emphasizing that the judge had assured the detective the warrant was valid, found that the officer had relied on the warrant in good faith, and that it was objectively reasonable for the officer to believe the warrant authorized the search he conducted.

Turning to the facts before us, we also must determine whether Officer White and the other officers involved in the search had a good faith objectively reasonable belief that the search they conducted was authorized by a valid warrant. We conclude that they did, and therefore find suppression improper.

When an officer conducts a search under the authority of a warrant issued by a neutral and detached magistrate, this "normally" establishes that the law enforcement officer has acted in good faith in conducting the search. (*United States* v. *Leon, supra,* — U.S. at p. — [82 L.Ed.2d at p. 698, 104 S.Ct. at p. 3421]; *United States* v. *Ross, supra,* 456 U.S. 798, 823, fn. 32 [72 L.Ed.2d 572, 593].) Thus, it appears there is a presumption that officers are conducting a search with good faith belief in its validity when the search is conducted pursuant to a warrant. (See *United States* v. *Leon, supra,* — U.S. at p. —, fn. 21 [82 L.Ed.2d at p. 697, 104 S.Ct. at p. 3420, fn. 21].) There is no evidence indicating that Officer White or the other officers who accompanied him were acting in bad faith, and we therefore find the search was conducted with a good faith belief in its validity.

The next (and more important) question is whether the good faith belief in the validity of the warrant was *objectively reasonable.* Again, we con-clude that it was. In this regard, it is unclear whether the present case is more like *Leon*—involving a warrant issued without probable cause—or *Sheppard*—involving a warrant marred by a defective description. The war-

rant under review may be deficient for either of two reasons. On one hand, it may be overbroad, meaning it permits a search of areas for which there is no probable cause to search. If this is the case, the magistrate would have *intended* to authorize a search of the entire fraternity, but this search would not have been supported by probable cause and therefore *Leon* is more relevant. On the other hand, the warrant may suffer not from lack of probable cause, but instead from a defective description on its face. Here, the magistrate would have intended to authorize a search of Neil MacAvoy's room *only,* but would have failed to do so. In this case, *Sheppard* would be more relevant.

We believe that this distinction is, for the most part, irrelevant, since the basic inquiry in both situations is whether the officers had a good faith objectively reasonable belief that the *search they conducted* was authorized by a valid warrant. What is important is "that the officers properly executed the warrant and *searched* only those places and for those objects that it was reasonable to believe were covered by the warrant." (*Leon, supra,* — U.S. at p. —, fn. 19, [82 L.Ed.2d at p. 696, 104 S.Ct. at p. 3419, fn. 19], italics added.) This is the essential prerequisite to the reasonable good faith exception. Because of this, we believe that the instant case is more properly viewed as a *Sheppard*-like situation involving a defect in description. The manner in which the officers conducted the search indicates that *they* did not believe the warrant in fact authorized a search of the entire fraternity house. Again, only appellant's room was searched. Had Officer White or the other officers in fact searched other parts of the building, it then would be pertinent to inquire whether they reasonably believed probable cause supported the issuance of a warrant authorizing a search of the entire fraternity, a more *Leon*-like approach. In applying *Leon* and *Sheppard,* however, we are concerned with the *officers'* objectively reasonable belief that the warrant properly authorized *the search they actually carried out.*

Because the officers only searched appellant's room, a search unquestionably supported by probable cause, it makes more sense to ask whether it was reasonable for the officers to believe the warrant adequately described the place they intended to search—appellant's room—than it does to ask whether the officers reasonably believed there was sufficient probable cause to support a warrant authorizing a search of the entire fraternity. Our assessment of the facts of this case therefore relies most heavily on the analysis in *Sheppard.*

In his affidavit Officer White informed the magistrate that the building he wished to search was a "multi room structure" with "large letters identifying the premises as Alpha Delta Phi." In addition, appellant's room number (112) was included in an exhibit attached to the affidavit. Although the

affidavit did not specifically inform the magistrate that the police sought to search a fraternity house we believe the description of the building and the accompanying exhibits were certainly sufficient to inform him of that fact. It was therefore incumbent upon *the magistrate* to limit the scope of the search to *Neil MacAvoy's* room in that fraternity house.

There is nothing on the face of the warrant to indicate to an officer that the warrant failed to adequately describe the place to be searched. Indeed, the place to be searched was described with great and apparently accurate detail.[9] Although the verbal assurances as to the validity of the warrant which the court relied on in *Sheppard* are lacking in this case, so too is the blatant defect on the face of the warrant. In *Sheppard,* the officer sought a warrant authorizing a search for evidence of a murder. Instead, he received a warrant authorizing a search for *controlled substances.* We believe that this patent error would have been obvious to a layman, and even more obvious to a police officer who had at least some familiarity with the Fourth Amendment's particularity requirement. The defect in the present case, however, is far less obvious than that in *Sheppard* and requires a deeper knowledge of Fourth Amendment law to detect. We therefore believe it was reasonable, even in the absence of additional verbal assurances, for Officer White and his fellow officers to believe that the warrant they received authorized the search they conducted.

Because Officer White and the other officers involved in the search had an objectively reasonable good faith belief that the warrant authorized the search they conducted, we are compelled to conclude that the evidence produced by that search should not be suppressed.

### III

 Appellant's next contention is that the officers who searched his room failed to comply with California's knock-notice requirement when they entered the fraternity's outer door.[10]

Viewing the evidence in the light most favorable to respondent (*People v. Archerd* (1970) 3 Cal.3d 615, 621 [91 Cal.Rptr. 397, 477 P.2d 421]), the record indicates that two groups of officers entered the fraternity through the front door and a side door roughly simultaneously. The front door was open, and the side door was either wide open or propped open. Several officers announced their presence before they entered the outer doors. One

---

[9] See the description set forth, *ante,* at page 752.

[10] Appellant has not argued that the officers failed to comply with the knock-notice requirement at the door to appellant's room.

officer also testified that he specifically remembered stating that he was a police officer and had come to serve a search warrant. There was conflicting evidence presented by a member of the fraternity who was present at the time of the search. He testified that the police did not announce their authority and purpose before entering the outer doors of the fraternity house.

The record before us would support a finding that the officers who conducted the search gave "notice of [their] authority and purpose" prior to entering the outer doors, and thereby complied with the California knock-notice statute. (Pen. Code, § 1531, *People* v. *Gallo* (1981) 127 Cal.App.3d 828, 383 [179 Cal.Rptr. 662].)[11] In denying appellant's motions to suppress and set aside the information, however, the trial judge did not explicitly find that the officers had given "notice of their authority and purpose;" rather, the trial judge found that "[t]he police officers were not required to comply with knock-notice on the door to the fraternity as it is the outer door of a multi-unit residence." Since it is unclear how the factual issue would have been resolved by the lower court, we must determine the *legal issue*; that is, whether the officers were required to comply with the knock-notice statute before entering the outer doors of the fraternity.

The following information concerning the fraternity house can be gleaned from the record. Approximately 50 students reside in the fraternity house; each is assigned a room by the university and given a key to his individual room. Visitors are not required to knock on the front door to gain entry, and there is no reception area (or receptionist) for visitors. If a visitor wishes to find a member of the fraternity, he or she can enter the building and then, in the words of a member of the fraternity, must either "know where [the person they intend to visit is] at, or ask somebody where [they] would be." Immediately inside the front door of the fraternity house is an empty foyer; immediately inside the side door is a hallway and staircase leading to the upper floors.

We are not aware of any California case addressing the general issue which confronts us here; that is, whether the police must comply with the knock-notice requirement when entering the outer door of a multiunit building. Although no California case is on point, several federal cases have addressed this issue. These cases have, of course, construed the *federal* knock-notice statute, but in pertinent part the federal statute is essentially

---

[11]Section 1531 provides: "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute the [search] warrant, if, after notice of his authority and purpose, he is refused admittance."

identical to the California knock-notice statute.[12] ■■ ■■ ■■ ■■ We therefore turn to the federal cases for guidance.[13]

■■ Appellant relies on *United States* v. *Fluker* (9th Cir. 1976) 543 F.2d 709 to support his contention; however, we find this case clearly distinguishable. In *Fluker,* federal DEA agents obtained a search warrant to search the defendant's apartment, which was one of two basement apartments located in a single building. The upper level of the building was occupied by the landlord. A common doorway led into a small corridor or entryway which was shared by the two basement apartments. The common doorway opening into the common corridor was usually locked (as it was on the day of the search) and only the tenants and landlord had keys. An outside stairway to the lower level apartments led directly down to this entry doorway. In executing the warrant, the DEA agents kicked down the common doorway without announcing their authority and purpose. Subsequently, they announced their authority and purpose at the door to the defendant's apartment, and, after gaining entry, performed a search yielding heroin and narcotics paraphernalia. (*Id.,* at p. 712.) In determining whether the federal agents were required to comply with the federal knock-notice statute at the outer door leading to the common corridor, the court noted that "the critical question . . . is whether, under the particular circumstances of this case, [the defendant] can be said to have a 'reasonable expectation of privacy' with respect to the corridor area separating the door of his apartment from the outer doorway of the apartment building." (*Id.,* at p. 716.) In concluding that the defendant *did* have a reasonable expectation of privacy, the *Fluker* court explicitly stressed the following factors: the corridor led to only two apartment units, rather than many; the outer door was kept locked; and defendant could probably hear a knock on the outer door from within his apartment. The court found "the two lower-level tenants thus exercised considerably more control over access to that portion of the building than would be true of a multi-unit complex, and hence could reasonably be said to have a greater reasonable expectation of privacy than would be true of occupants of large apartment buildings. [Citation.]" (*Ibid.*) In holding that the DEA agents were required to comply with the federal knock-notice statute at the outer door the court stressed that its holding was confined to the facts of the case before it. (*Id.,* at p. 717.)

---

[12]The federal statute, 18 United States Code section 3109, provides: "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant." Compare the California statute quoted *ante* at footnote 11.

[13]Although this court is not bound by the decisions of the lower federal courts, "they are persuasive and entitled to great weight." (*People* v. *Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129].)

By contrast, appellant's fraternity house contains approximately 50 individual units, access to the building during the day is not restricted, and since appellant's room is on the upper floors, it is highly unlikely that he could hear a demand for entry made at the outer doors of the fraternity house. Furthermore, there is no formal reception area in the fraternity house, and visitors are apparently allowed to roam the halls freely looking for their friends. Because of this, we conclude appellant did not have a reasonable expectation of privacy in those areas of the fraternity house leading directly from the outer doors to his room.

The present case is similar to *United States* v. *Perkins* (D.D.C. 1968) 286 F.Supp. 259, affirmed (D.C. Cir. 1970) 432 F.2d 612 [139 App.D.C. 179] (*per curiam*), certiorari denied (1970) 400 U.S. 866 [27 L.Ed.2d 106, 91 S.Ct. 108]. In *Perkins,* the federal knock-notice statute was found inapplicable to the unannounced entry by searching officers of the front door of a three-story rooming house. The defendant's room was on the second floor, and the officers entered on the ground floor through an open front door, without announcing their authority or purpose. (*Id.,* at p. 261.) The district court found that no purpose would have been served by the officers knocking on the first floor door because "[t]he officers entered by way of the common, open means of ingress normally used by those who came to the premises," and thus "[n]o privacy of the defendant's was unreasonably invaded, no affront was made to the integrity of his home, and no potential for harm to the officers was stirred by [their] peaceful unannounced passage through the open front doorway." (*Id.,* at p. 263.) The court also noted that an announcement at the front door would have served no purpose since the defendant's room was so distant from the front doorway that he would have been unable to hear the announcement. (*Id.,* at p. 264; see also *United States* v. *St. Clair* (S.D.N.Y. 1965) 240 F.Supp. 338.)

Finally, appellant claims that, under the circumstances of this case, the three underlying purposes of the knock-notice statute required that the police announce themselves at the outer door of the fraternity. We disagree.

■ The three basic purposes of the knock-notice requirement are: (1) protection from violence, assuring the safety of both the occupants and the entering officer; (2) protection of the occupants' right of privacy; and (3) protection against the needless destruction of private property. (*People* v. *Gallo* (1981) 127 Cal.App.3d 828, 838 [179 Cal.Rptr. 662]; *People* v. *Freund* (1975) 48 Cal.App.3d 49, 57 [119 Cal.Rptr. 762].) ■ There was no serious risk of violence resulting from the unannounced entry of the police officers in this case because the entry was made in the daytime through open doors; in addition, many (if not most) members of the fraternity were aware of the police before they entered the building as several

officers were dressed in police "raid" uniform. Secondly, as discussed previously, appellant did not have a reasonable expectation of privacy in the areas leading from the outer doors to his room. Finally, because the doors were open there was no needless destruction of personal property occasioned by the breaking of a door.

In sum, we conclude that *under the circumstances of this case* the officers were not required to comply with the California knock-notice statute at the outer doors of the fraternity. We hasten to note, however, that our decision in this case should not be read as declaring open season on California's fraternity houses. This issue is admittedly close. Had the outer doors to the residence been kept locked, or visitors required to check into a reception area, we might well have found that knock-notice was required at the outer doors. In addition, this case should not be taken as a proclamation that the residents of a fraternity house or like structure have no reasonable expectation of privacy in any common areas of the residence, such as a kitchen or living room. The narrow import of our decision is simply that, on the facts of this case, appellant did not have a reasonable expectation of privacy in the areas (such as halls) leading directly from the outer doors to his room.

The judgment is affirmed.

Rouse, J., and Smith, J., concurred.