Filed 5/14/13  P. v. Mesiti CA2/8

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARK EDWARD MESITI,<br><br>    Defendant and Appellant. | B233416<br><br>(Los Angeles County<br>Super. Ct. No. BA354654)<br><br>**ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING**<br><br>[No change in the judgment] |

IT IS ORDERED that the opinion filed in the above-captioned matter on April 17, 2013, be modified as follows:

1.  On page 5, the first full paragraph, the second sentence is deleted, and replaced with:

The District Attorney's Office also confirmed that Mesiti "was exposed to prison time due to his prior domestic violence."

2.  On page 14, the first full paragraph is deleted, and replaced with:

As for Mesiti's assertion that the affidavit was not referenced in the search warrant and was not attached to the search warrant when the search warrant was faxed to Los Angeles County from Stanislaus County,[1] he either does not include a reference to the record, or the references that he does include do not support his claim.  As for the search warrant, it expressly states on page 1 that it was issued upon "proof, by affidavit."  Mesiti presented the four-page search warrant and 15-page affidavit to the trial court together, as

---

[1]  "There is a fundamental distinction . . . between a warrant and the underlying affidavit, and the affidavit is not necessarily part of the warrant or available to define the scope of the warrant."  (*People v. MacAvoy* (1984) 162 Cal.App.3d 746, 755.)

an exhibit attached to his motion to traverse ("EXHIBIT A"). The motion to traverse did not specifically argue that the search warrant only was faxed to Los Angeles County. In broad terms, the motion to traverse argued that the entirety of the warrant process, including the issuance and form of the warrant, and sufficiency of the affidavit, had been deficient. There is no evidence in the motion to support a factual finding that only the four-page search warrant was faxed to Los Angeles, without the underlying affidavit. At the hearing on Mesiti's motion to traverse, no evidence was offered on the issue of what papers were faxed or not faxed to Los Angeles County. In addition, there was no claim made that the affidavit had not been attached to the search warrant.

This modification effects no change in the judgment.

The petition for rehearing filed by Appellant on May 6, 2013, is denied.

_____

BIGELOW, P. J.                    RUBIN, J.                    GRIMES, J.

Filed 4/17/13  P. v. Mesiti CA2/8    (Unmodified version)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B233416 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA354654) |
| v. | |
| MARK EDWARD MESITI, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Anne H. Egerton, Judge.  Affirmed.

Tanya Dellaca, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey and Esther P. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant and appellant Mark Edward Mesiti filed a motion to traverse and quash two search warrants, arguing that an initial warrant lacked probable cause and was facially defective, and that the second was the fruit of the first. By the same motion, Mesiti sought to suppress drug-related evidence seized during the execution of the second warrant. (Pen. Code, § 1538.5.) The trial court denied Mesiti's motion, and a jury then convicted Mesiti of manufacturing a controlled substance, methamphetamine. (Health & Saf. Code, § 11379.6, subd. (a).) On appeal, Mesiti contends the trial court erred in denying his motion attacking the search warrants. We affirm the judgment.

## FACTS

### 1. Background

In the summer of 2006, Mesiti lived with his teenage daughter, Alycia, in a rented property at 3576 Alexis Avenue in the City of Ceres, in Stanislaus County. In August 2006, Mesiti's girlfriend, Shelly Walker, reported to police that Alycia was missing. Sometime later, Mesiti began living with Walker and her daughter in Los Angeles.

On March 25, 2009, officers from the Ceres Police Department (CPD) executed a search warrant, which is not involved in the current appeal, at the Alexis Avenue property in Ceres. Alycia's buried remains were found in the property's backyard.

### 2. The Stanislaus Warrant

On March 27, 2009, CPD Officer Keith Griebel presented an affidavit for a search warrant in the Stanislaus County Superior Court concerning events related to Mesiti and Alycia. On the same day, a superior court judge in Stanislaus County signed a document entitled "SEARCH WARRANT" that is the subject of Mesiti's current appeal.[1]

Officer Griebel's affidavit in support of the application for the search warrant included the following information based upon his personal investigation, and upon information and evidence provided to him by fellow investigating officers. Alycia was

---

[1] On appeal, Mesiti does not dispute that the Stanislaus warrant authorized the police to conduct a search. His contention that the warrant was facially defective for lack of specificity in describing the place to be searched and the property to be seized will be addressed below.

2

the subject of a missing persons investigation beginning in August 2006. Walker reported Alycia missing. At the time, Mesiti and Alycia lived at the Alexis Avenue property. Walker stated in her initial missing person report that Alycia was supposed to go to a friend's house in San Jose on August 11, 2006. On August 13, 2006, Alycia called Walker. Alycia said she was not in San Jose, but instead was camping with "old friends." She did not disclose where. Walker reported Alycia missing on August 15, 2006.

On September 8, 2008, Detective Mark Neri[2] spoke to Alycia's mother, Roberta Allen, "inquiring about the status of the [missing person] case." Allen said she lost custody of Alycia to Mesiti in August or September 2005, and had not heard from Alycia since Mother's Day of 2006.

On September 10, 2008, Detective Neri contacted Walker "and re-interviewed her." At that time, Walker said she and Mesiti were dating in the summer of 2006. Around the time of early to mid-August 2006, Walker understood that Alycia was staying with friends in San Jose. Walker had planned on flying to San Jose on Sunday, August 13, 2006, to pick up Alycia, and then drive her home to Ceres. On Saturday, August 12, 2006, or early Sunday, August 13, 2006, Walker spoke to Mesiti who told her to drive to Ceres without picking up Alycia because her friends' parents were taking her home instead. Later on August 13, 2006, Walker overheard Mesiti talking on the telephone with a female whom Walker believed was Alycia. When the phone call ended, Mesiti told Walker that Alycia was camping, and would be back on Monday, August 14, 2006. Walker had no contact with Alycia on Monday, August 14, 2006, and has had no contact with her since that time. On August 15, 2006, Walker reported to the CPD that Alycia was missing.

Detective Neri tried to speak with Mesiti "on several occasions," but Mesiti "made several excuses" why he could not talk. The affidavit does not provide any detail about

---

**2**     The search warrant affidavit references certain law enforcement officers as "Det.," and "Sgt." We assume these are short for Detective and Sergeant, respectively, and refer to them as such.

the dates or timing of the occasions when Detective Neri tried to talk to Mesiti. Read within the framework of the affidavit, it appears that Detective Neri's attempts to speak to Mesiti were in the same general time frame of September 2008, when the detective spoke to Allen and Walker. Detective Neri finally spoke with Mesiti by telephone on September 10, 2008. Mesiti stated that, at the time Alycia went missing, she had been dating a heroin user. On the weekend of Alycia's disappearance, she was supposed to be with her friend, Ashley, in San Jose. She left while Mesiti was "working on something" in the house; he did not see the car in which Alycia left. Alycia took a backpack with some clothes and other personal items, and one of her Chihuahua dogs on a leash. On the evening of Friday, August 11, 2006, Alycia called Mesiti to say she had reached her destination. At about 5:00 or 6:00 p.m., on Sunday, August 13, 2006, Alycia called and told Mesiti that she did not go to Ashley's home in San Jose, but was actually camping with friends and would be back in "a couple of days."

Mesiti told Detective Neri that Alycia "seemed to be stressed out" about a family court matter at the time of her disappearance. She was "upset because she had to go to family court and discuss the family and domestic violence cases that had occurred in the most recent past." Mesiti said he did not believe Alycia ran away because she left the majority of her clothing in her bedroom, and a second Chihuahua at home.

Though the warrant does not disclose specific dates, the affidavit indicates that during the course of the investigation, CPD Sergeant James Robbins spoke to three family members. The family members stated that they were in Poland when Alycia went missing. When they returned, Mesiti told them that Alycia became addicted to heroin; he told them that Alycia overdosed "the night before she 'left.' " According to Mesiti, he felt he could not call police or an ambulance when Alycia overdosed because he had an "active warrant." Instead, Mesiti called a friend, and they revived Alycia. Mesiti told the family members that Alycia left on her trip the next day and did not return. Sergeant Robbins "was told" by the family members that Alycia was supposed to testify against Mesiti "in a domestic violence case in which he was the suspect and the victim was [Alycia's mother] Allen."

4

The affidavit also recited that CPD Officer Griebel confirmed with the Santa Clara District Attorney's Office that Alycia was to testify against Mesiti in a domestic violence case in which he was a suspect and Allen was the victim. The District Attorney's Office also confirmed that Mesiti had been incarcerated for prior domestic violence charges. The District Attorney's Office informed Officer Griebel that the absence of Alycia's testimony caused a plea agreement in the domestic violence case that resulted in Mesiti suffering only a fine instead of jail time. Officer Griebel learned from utility records that Mesiti paid utilities at the Alexis Avenue property in Ceres through February 2007, six months after Alycia's disappearance.

On a date not stated in the affidavit, Sergeant Sullivan talked to Mercedes Macias, the owner of the Ceres residence where Mesiti had lived. Macias said that, "a short time" after Mesiti moved out, she discovered a large hole in the middle of the backyard covered with dirt and grass.

On March 25, 2009, a search warrant was issued for the property at Alexis Avenue in Ceres. Police executed the warrant the same day, and human remains were found buried in the backyard, wrapped in "a heavy black plastic" and bound with duct tape. The Stanislaus County Coroner's Office determined the remains were Alycia's through dental records.

On March 26, 2009, officers spoke with Mesiti's sister, Diane Mesiti-Miller who said that Mesiti moved to Los Angeles to stay with Walker. Mesiti-Miller informed officers that Mesiti contacted her by email in November 2006 asking her to stay out of the investigation of Alycia's disappearance because he had launched his own. The email included this statement: "Let me make one thing clear to you. Alycia did not runaway."

On March 27, 2009, CPD Detective James Yandell contacted the FBI for assistance in locating Mesiti. CPD received information that Mesiti lived at "2120 Bentley Ave., Apt. # 101, Los Angeles." That same day, Detective Yandell and other officers from the CPD travelled to Los Angeles, and set up surveillance of the Bentley Avenue location. A postal worker confirmed that he regularly dropped off packages for Mesiti at that address.

5

Officer Griebel concluded his affidavit with a series of statements based on his training and experience as a police officer, including that "people involved in domestic disputes, including homicide, will tend to hide evidence of their crime in places which [they have] domain and control over." Officer Griebel further stated that "people will utilize a computer and the internet to research [how] to both commit and hide their crimes. They also use computers to communicate with co-conspirators as well as publish false or misleading information in order to avoid detection and/or shift culpability." Officer Griebel also stated that text messages on cellular telephones and email messages, as well as address books "may help in identifying potential witnesses and/or other suspects."

**3.    The Execution of the Stanislaus Warrant**

On March 27, 2009, six officers from the CPD, along with three officers from the Los Angeles Police Department (LAPD) executed the Stanislaus search warrant at 2120 South Bentley Avenue, apartment No. 101, West Los Angeles. Immediately upon entering the premises, CPD Detective Derek Perry experienced a "burning sensation" in his throat and lungs, and on his skin. Based on his prior experience as a police officer, he believed a methamphetamine lab was in the apartment. The officers evacuated the apartment and transported Mesiti to the police department station in West Los Angeles. During the transport, Detective Perry noticed a chemical odor coming from Mesiti as well as burn marks on his hands and forearms. In addition to Mesiti's appearance, Detective Perry noticed that Mesiti behaved aggressively, followed by drowsy spells and outbursts of profanity.

**4.    The Los Angeles Warrant**

On March 28, 2009 a Los Angeles County Superior Court judge signed a warrant commanding police to search the premises at "2120 S. Bentley Avenue #101, West Los Angeles," for evidence of methamphetamine and materials used for the manufacture and sale of methamphetamine. LAPD Detective Frank Lyga presented the affidavit for the warrant. Detective Lyga's affidavit in support of the request for the search warrant included the following information.

6

Detective Lyga is an experienced narcotics officer. On March 28, 2009, Detective Lyga received a request from a supervisor to respond to assist officers of the CPD at the scene of a possible methamphetamine laboratory at 2120 South Bentley Avenue, West Los Angeles, inside an apartment. When he arrived at the scene, Detective Lyga spoke to officers from the CPD who explained that they entered the apartment to serve a search warrant. The officers cleared the apartment, then, when one of the officers forced open the door of a locked bathroom, he observed "numerous glass beakers and hoses." Based on these observations, the officer formed the opinion that the bathroom contained an active drug lab. The officers evacuated the apartment, and had called for assistance from the LAPD. Detective Lyga interviewed Detective Yandell regarding the items observed in the bathroom. Based on his experience, Detective Lyga formed the opinion that the apartment contained an active methamphetamine lab.

**5.     Execution of the Los Angeles Warrant**

After obtaining the Los Angeles warrant, LAPD officers returned to Mesiti's apartment, and executed the search warrant. LAPD Detective David Richardson returned to the scene first, at about 8:00 p.m. Inside the apartment, there were several packages with Mesiti's name and the address "2120 South Bentley Avenue, Apartment 101." The apartment was "very cluttered" and "very jumbled," with "a lot of dirty items." Inside a hallway bathroom, Detective Richardson located and photographed a methamphetamine lab consisting of glassware, heating flasks, heating mantles, gallons of solvents, support racks for laboratory grade glassware, and a fan to ventilate fumes out of the bathroom. Plastic containers with various different powders in each littered the apartment. Detective Lyga also returned to the apartment. Detective Lyga and his fellow officers recovered chemicals and substances consistent with the manufacturing and production of methamphetamine.

**6.     The Criminal Proceedings**

The People filed an information charging Mesiti with manufacturing a controlled substance, methamphetamine (count 1; Health & Saf. Code, § 11379.6, subd. (a)); and

7

child abuse (count 3; Pen. Code, § 273a, subd. (a)).**3** Mesiti filed a motion to traverse and quash the Stanislaus search warrant and the Los Angeles search warrant. As to the Stanislaus warrant, Mesiti argued it was based on a " 'barebones' " affidavit, and otherwise was "lacking fundamental constitutional safeguards." As to the Los Angeles warrant, Mesiti argued that it was the fruit of the deficient, underlying Stanislaus warrant.

Mesiti's motion challenged the Stanislaus warrant on two fronts. First, "[t]he inartfully drawn out of county warrant form not only failed to state the city, county or state where the property to be searched was located, it did not even authorize a search of the premises." (Boldface & italics omitted.) Second, the motion argued that more than two years had passed from Alycia's death to the issuance of the Stanislaus warrant. During that time, Mesiti moved to Los Angeles and occupied an apartment residence with Walker and her child. It necessarily followed that the Stanislaus warrant was not supported by probable cause that evidence of a crime would be found at the Los Angeles premises. As argued in the motion, the affidavit in support of the Stanislaus search warrant set forth a detailed description of the facts leading to the discovery of Alycia's body in Ceres, but it "lacked a single fact that would lead a person to a reasonable suspicion that evidence of the Ceres homicide would be found in the Los Angeles residence." (Boldface & italics omitted.) "The fact that . . . Mesiti was a person of interest in an over two-year old homicide" did not "in itself" show probable cause for a search of his present residence in Los Angeles.

On February 1, 2010, the parties argued the motion to the trial court. The record before us on appeal shows that no testimony was taken at the hearing on the motion; the arguments in the moving and opposing papers were based on references to the face of the warrants being challenged by Mesiti. At the conclusion of the hearing, the court denied the motion for the following stated reasons:

---

**3** The information also included a count for possession of a controlled substance, methamphetamine (count 2; Health & Saf. Code, § 11378). The record does not disclose the disposition of count 2; it was not submitted to the jury at the time of trial.

8

"At the outset . . . , addressing the issues raised regarding the Stanislaus County warrant, the court disagrees with the characterization made by the defense as to the ways in which the warrant and affidavit were deficient. It may be that there were some technical irregularities, but I think nothing that raises to the level of causing any sort of constitutional error. I think it was crystal clear what the – based upon the affidavit and the warrant, it was crystal clear what premises were to be searched. [¶] . . . I do not agree in the strongest terms about the allegation by counsel that this was a bare bones affidavit. I believe that it's set forth in great detail the background of the investigation. And while the death of the victim in this case occurred quite some time ago, there was very fresh evidence which gave rise to obtaining the search warrant and I believe that any deficiencies that were accused or alleged sort of imperfections in the process, were insufficient to cause this court to set that warrant aside."

Addressing the Los Angeles warrant, the court essentially found that the original police entry into Mesiti's apartment had been legal under the Stanislaus warrant. As a result, the ensuing Los Angeles warrant was proper.

The charges against Mesiti were tried to a jury. Before the cause was submitted to the jury, the trial court granted Mesiti's section 1118.1 motion as to count 3. The evidence at trial established the facts summarized above in the search of Mesiti's local residence under the Los Angeles warrant. The jury returned a verdict finding Mesiti guilty of manufacturing a controlled substance, methamphetamine. The trial court sentenced Mesiti to a total term of five years in state prison.

Mesiti filed a timely notice of appeal.

## DISCUSSION

### I. Probable Cause

Mesiti claims his drug manufacturing conviction must be reversed because the evidence of the offense was seized from his residence in violation of his right to be free from unreasonable searches and seizures under the Fourth and Fourteenth Amendments

9

of the United States Constitution and article I, section 13 of the California Constitution. Specifically, he argues that neither the Stanislaus warrant nor the Los Angeles warrant were supported by probable cause. Mesiti argues his motion to traverse and quash the Stanislaus and Los Angeles warrants, and to suppress the drug-related evidence seized from his Los Angeles apartment should have been granted. We disagree.

## A.     Standard of Review

Under Penal Code section 1538.5, subdivision (a), a defendant may move to suppress evidence gathered in violation of the state and or federal Constitutions. Here, Mesiti's motion to suppress argued there was no probable cause for either warrant, resulting in a violation of the state and federal Constitutions. (U.S. Const., 4th Amend.; Cal. Const., art. I, § 13 [no search warrant shall issue except upon probable cause].) In reviewing a denial of a motion to suppress evidence, we defer to the trial court's factual findings, upholding them when they are supported by substantial evidence; we then independently review the trial court's decision, based on the historical facts, that the search did not violate the Fourth Amendment. (*People v. Memro* (1995) 11 Cal.4th 786, 846.)

"The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that . . . evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for  . . . [concluding]' that probable cause existed." (*Illinois v. Gates* (1983) 462 U.S. 213, 238-239.) A warrant is presumed valid; the defendant bears the burden of proving a warrant is not supported by probable cause. (*People v. Amador* (2000) 24 Cal.4th 387, 393 (*Amador*).) Accordingly, we pay great deference to the magistrate's determination of probable cause on review. (*People v. Tuadles* (1992) 7 Cal.App.4th 1777, 1783; see *Illinois v. Gates*, *supra*, at pp. 236-241.)

### B.     Analysis

Mesiti contends the affidavit in support of the Stanislaus search warrant did not support a finding of probable cause that evidence related to Alycia's death in 2006 would be found in Mesiti's Los Angeles apartment in 2009.  Mesiti argues the affidavit fails to show a nexus between the discovery of Alycia's remains in Ceres, and the apartment on South Bentley Avenue in Los Angeles.  We disagree.

Mesiti was Alycia's father; they lived together at the property where Alycia's body was discovered.  He did not report Alycia missing, his girlfriend did.  Mesiti left the property about six months after Alycia disappeared.  He told his sister to stay out of the missing person investigation, and told his sister that he knew Alycia did not run away.  When interviewed by police, Mesiti stated that when Alycia went missing she left behind personal possessions such as clothing and a computer.  At the time Mesiti was vacating the premises, the landlord observed Mesiti's sister helping to clean out items from the home.

Officer Griebel stated that in his training and experience as a police officer, "people involved in domestic disputes, including homicide, will tend to hide evidence of their crime in places which [they have] domain and control over."  Officer Griebel further stated that "people will utilize a computer and the internet to research [how] to both commit and hide their crimes.  They also use computers to communicate with co-conspirators as well as publish false or misleading information in order to avoid detection and/or shift culpability."  Officer Griebel also stated that text messages on cellular telephones and email messages, as well as address books "may help in identifying potential witnesses and/or other suspects."

Based on the totality of the circumstances, we are satisfied there was substantial evidence to show a fair probability that evidence related to Alycia's death would be found at Mesiti's new residence in Los Angeles even two and one-half years later.  This was not a search of a mere "person of interest" in a cold case homicide.  This was a search of a home of the parent of a victim whose homicide or the disposal of her body took place in the prior family home.  There was a fair probability that as the victim's

father, Mesiti, may have retained Alycia's personal effects, electronic communications or the computer he owned during the time of her disappearance. These items, Officer Griebel indicated, would be evidence of a crime and likely still in his possession.

Mesiti's argument that there are "stale facts" in the affidavit does not persuade us to find otherwise. (*People v. Hulland* (2003) 110 Cal.App.4th 1646, 1652 [information that is remote in time may be deemed stale and thus unworthy of consideration for probable cause in a warrant].) Given the totality of the circumstances, in particular the special relationship between Mesiti and the victim, the objects of the search, we disagree that the remoteness of the crime must as a matter of law defeat a finding of probable cause. Mesiti argues that any evidence related to Alycia's death had to be several months to several years old by the time the affidavit was presented. Mesiti ignores that the discovery of Alycia's body was freshly discovered evidence. Before the body was discovered, there was not a homicide to investigate. Once the body was discovered, with a connection to Mesiti, a search warrant was obtained. Though the death occurred more than two years ago, there was a nexus to Mesiti's current home based upon the familial relationship, and the tendency of domestic violence suspects, as noted by Officer Griebel, to keep materials related to the violence in areas under a suspect's control.

## II. The Form and Content of the Stanislaus Warrant (Particularity)

Mesiti next contends the Stanislaus warrant was facially defective because it failed to describe with sufficient particularity the place to be searched and the items to be seized. In making his argument, Mesiti focuses on the four-page warrant itself, disregarding CPD Officer Griebel's affidavit. Mesiti claims that after the warrant was issued in Stanislaus, it was faxed to Los Angeles where it was executed by waiting CPD officers, assisted by the LAPD. Mesiti asserts: "The affidavit was not referenced in the search warrant and was not attached [to the search warrant] when the [search warrant] was faxed" to Los Angeles from Stanislaus County. We find the search warrant was not facially defective.

12

A search warrant must particularly describe the place to be searched so that it limits the search to areas which probable cause permits and avoid exploratory searches. (*Amador*, *supra,* 24 Cal.4th at p. 392.) In short, the particularity requirement precludes issuance of a warrant authorizing a fishing expedition in any and all waters at the discretion of the police officers executing the warrant. At the same time, complete precision in describing the place to be searched is not required; if a description in a warrant allows the officer executing the warrant to reasonably ascertain and identify the place intended to be searched under the warrant, the warrant will pass constitutional particularity requirements. (*Ibid.*) Thus, where part of the description of the premises to be searched is inaccurate, but the description has other parts that identify the place to be searched with particularity, searches pursuant to such warrants have been " 'routinely upheld.' " (*Amador, supra*, at p. 392, quoting *United States v. Gitcho* (8th Cir. 1979) 601 F.2d 369, 371.) The test for determining the sufficiency of the description of the place to be searched is whether the place to be searched is described with sufficient particularity " 'as to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premise might be mistakenly searched.' " (*Amador, supra*, at p. 393, quoting *United States v. Gitcho, supra*, at p. 371.)

While the address reflected in the Stanislaus warrant and affidavit was incorrectly identified the property as 2120 Bentley Avenue, rather than South Bentley Avenue, and identified the property as being in Los Angeles, rather than in the neighborhood of Los Angeles known as West Los Angeles, the warrant described with particularity the exterior of the apartment, and the efforts of the CPD officers to verify that Mesiti resided at the apartment building, in a particular unit (No. 101). There was no inaccuracy in the description of the unit (No. 101) authorized to be searched. There was no reasonable probability that another premises might have been mistakenly searched by the CPD officers.

As for Mesiti's assertion that the affidavit was not referenced in the search warrant and was not attached to the search warrant when the search warrant was faxed to Los Angeles from Stanislaus County, he either does not include a reference to the record, or the references that he does include do not support his claim.[4] The warrant expressly states that it was proved up by the affidavit, and the fax codes printed on the pages of the documents in the record show that 20 pages were faxed from Stanislaus to Los Angeles. In Mesiti's motion to traverse, he presented the search warrant and affidavit together. We see no evidence showing that the four-page Stanislaus warrant was faxed to Los Angeles without the supporting affidavit. There was no evidence taken on this issue at the time of the hearing on Mesiti's motion to quash.

Mesiti also contends the Stanislaus warrant "imposed no meaningful restriction on the items to be searched and seized." He argues the warrant did not identify him as a suspect, and thus unconstitutionally allowed an overbroad seizure of items not connected to any specific person. He argues these defects were not cured by the affidavit because it was not referenced in the warrant and not attached to the warrant when it was faxed. For the reasons explained above, we find the evidence shows the affidavit was attached to the warrant. The entire document sufficiently focused on evidence related to Mesiti and Alycia.

### III. Good Faith

Mesiti contends the good faith reliance exception (see *United States v. Leon* (1984) 468 U.S. 897 (*Leon*)) does not apply in his case. Under *Leon*, evidence seized pursuant to a defective search warrant is admissible if the executing officer's reliance on the warrant was objectively reasonable. Even if our determination of probable cause is incorrect, we find the good faith reliance exception applies.

---

[4]     "There is a fundamental distinction . . . between a warrant and the underlying affidavit, and the affidavit is not necessarily part of the warrant or available to define the scope of the warrant." (*People v. MacAvoy* (1984) 162 Cal.App.3d 746, 755.)

14

The good faith reliance exception "is not a magic lamp for police officers to rub whenever they find themselves in trouble [in executing a warrant]." (*People v. Hulland*, *supra,* 110 Cal.App.4th at p. 1656.) As the United States Supreme Court explained in *Leon*, the suppression of evidence remains an appropriate remedy in a variety of circumstances. Where an affiant misled the magistrate who issued the warrant with information the affiant knew or should have known was false, or the magistrate wholly abandoned his judicial function, or the warrant was based on an affidavit so lacking in indicia of probable cause as to render an executing officer's belief in the existence of probable cause "entirely unreasonable," or if the warrant itself is facially deficient, suppression may still be proper. (*Leon*, *supra*, 468 U.S. at p. 923.) But, as the Supreme Court reasoned in *Leon*: "suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion," as long as the law enforcement officer acted in good faith. (*Id.* at p. 922; see also *United States v. Ross* (1982) 456 U.S. 798, 823.)

In Mesiti's case, the officers who executed the Stanislaus warrant acted in good faith reliance on the warrant. There is nothing in the record to show that any of the facts in the supporting affidavit were false. Although the warrant might have been more carefully crafted, the record does not support a conclusion that the magistrate wholly abandoned his judicial function. The warrant and affidavit included extensive facts showing an investigation, and we see nothing to support the conclusion that the executing officers should have known there was no support for the magistrate's probable cause determination. As we explained above, we do not find the warrant facially defective.

## IV.    *Pitchess* **Discovery**

In September 2010, Mesiti filed a motion for discovery of the personnel records of several police officers. (See *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*); see Pen. Code, § 832.5; Evid. Code, § 1043 et seq.) Mesiti sought review and disclosure of relevant materials concerning the following officers: CPD Detectives Yandell, Perry, and Officer Griebel; former CPD Detective Neri; and LAPD Detective Lyga. The motion

15

sought discovery of complaints by members of the public of dishonesty, falsification of police reports, and similar categories bearing on credibility.

The trial court denied Mesiti's *Pitchess* motion as to LAPD Detective Lyga. At the hearing, Mesiti's counsel conceded that all of Detective Lyga's acts had ensued from the issuance and execution of the Stanislaus warrant connected with the CPD. The court found no good cause for discovery as to Detective Lyga because there was no allegation of misconduct as to him.

At a later hearing, new counsel appeared on behalf of Mesiti, and conceded that there were defects in the *Pitchess* motion filed by Mesiti's former counsel. The court then denied the motion as to the CPD officers.

Thereafter, Mesiti's new counsel, filed a second *Pitchess* motion, seeking discovery as to all of the officers noted above, and also CPD Officer Jeremy Caron. The trial court granted *Pitchess* discovery as to CPD Officer Caron, Detectives Yandell, and Perry, and LAPD Detective Lyga. The court found "no basis" for discovery of the personnel records of CPD Detective Neri or Officer Griebel based on the prosecutor's representation that they were not going to be called as witnesses in the drug matter being tried in Los Angeles, and thus would not be subject to impeachment with anything in their personnel files.[5] On the same day, the court conducted an in camera review of records from the CPD and LAPD to determine whether relevant, discoverable material existed. The court ordered discovery of items as to LAPD Detective Lyga; the court found no discoverable items as to CPD Officer Caron and Detectives Yandell and Perry.

Mesiti requested our court to conduct an independent review to determine whether the trial court conducted a proper hearing, and made a proper ruling after the in camera hearing on his *Pitchess* motion. (See *People v. Mooc* (2001) 26 Cal.4th 1216.) We have reviewed the transcript of the in camera hearing and conclude the trial court conducted the hearing properly, describing the nature of all complaints, if any, against the officers,

---

[5] The ruling on the *Pitchess* discovery motion occurred after the issue of the validity of the warrants had already been litigated and concluded.

16

and we find the court did not abuse its discretion in ordering the custodian of records to disclose discovery as noted above.

## DISPOSITION

The judgment is affirmed.


BIGELOW, P. J.


We concur:


RUBIN, J.


GRIMES, J.

17